# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ROXANNE SCHLENDER,

    **Plaintiff,**

    **v.**                                    **Case No. 23-CV-329**

CHARLES SEELOW, et al.,

    **Defendants.**

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On March 13, 2017, Roxanne Schlender was injured during an encounter with Milwaukee Police Department Officer Charles Seelow at the Potawatomi Bingo Casino in Milwaukee, Wisconsin. Schlender sues Officer Seelow under 42 U.S.C. § 1983, alleging he unlawfully detained her and used excessive force against her in violation of her Fourth and Fourteenth Amendment rights. Schlender further seeks to hold the City of Milwaukee liable under state law through indemnification, and under federal law under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Defendants move for summary judgment in their favor on the grounds that Schlender's claims fail on the merits or alternatively, that Defendants are entitled to qualified immunity. (Docket # 26.) For the reasons further explained below, the Defendants' motion for summary judgment is granted in part and denied in part.

# FACTS

*1. Background Facts*

Potawatomi Bingo Casino, a gaming and entertainment venue located at 1721 Canal Street, Milwaukee, Wisconsin, is operated by the Forest County Potawatomi Community, a federally recognized Indian Tribe. (Joint Statement of Undisputed Facts at Summary Judgment ("Undisputed Facts") ¶ 5, Docket # 24.) The City of Milwaukee and the Tribe have an agreement for Milwaukee Police Department ("MPD") officers to assist with security and law enforcement duties at the Casino. (*Id.* ¶ 6.) Pursuant to the Agreement, "[a]t all times and under all circumstances of this Agreement, MPD personnel shall remain under the sole command of MPD supervisors, and shall remain employees of the City of Milwaukee for all purposes whatsoever [;]" and "[t]he actions of the MPD personnel shall be governed by the policies and practices of the City and MPD as exercised in the discretion of the City and the Chief." (*Id.* ¶ 7.) The Casino also employs private security staff and maintains a private security department. (*Id.* ¶ 8.) The Casino has a network of overhead security cameras monitored by security staff. (*Id.* ¶ 10.) The parties have received seven surveillance videos from inside the Casino that depict events recorded on March 13, 2017. (*Id.* ¶ 11.)

*2. The March 13, 2017 Incident*

### 2.1  Schlender's Arrival at the Casino

Roxanne Schlender was a patron at the Casino on March 13, 2017. (*Id.* ¶ 23.) Schlender testified that after leaving work that day, she had a meal with a friend where she consumed "maybe a half a glass of wine." (Second Declaration of Clint Muche ("Second Muche Decl.") ¶ 3, Ex. 1, Deposition of Roxanne Schlender ("Schlender Dep.") at 62–63,

2

68, Docket # 38-1.) Afterwards, Schlender drove herself to the Casino and arrived at approximately 7:00 p.m. (*Id.* at 63.) Schlender testified that after arriving at the Casino, she "had a couple drinks" and gambled. (*Id.* at 64.) Although she could not remember the exact number of drinks she had that night, she testified that she was drinking chardonnay and received her drinks from Bar 360, a bar in the Casino. (*Id.* at 64–65.) Schlender testified that she had surgery in late 2016 (*id.* at 55) and while she had prescription medication in her purse from her surgery, she had not taken any medication of any kind that day (*id.* at 65–66).

Schlender testified that while playing at the slots, she noticed a man looking at her. (*Id.* at 71.) She left the slots and went to the high stakes room, and then to the roulette. (*Id.*) Everywhere she went, she noticed the man in the vicinity. (*Id.*) Schlender testified that he was making her uncomfortable, so she went to the women's restroom. (*Id.* at 72.) Schlender wanted to stay in the bathroom for a while to give the man time to leave. (*Id.* at 75.) While in the bathroom, Schlender freshened up her makeup, looked at her phone, and went to the toilet. (*Id.*) Although it is unclear precisely how long Schlender remained in the bathroom, she testified that she was there "for some time waiting." (*Id.* at 76.)

### 2.2   Schlender's Removal from the Bathroom

The record contains the Casino's surveillance video footage beginning at 9:30:02 p.m. (Declaration of Clint Muche ("Muche Decl.") ¶ 3, Ex. A.) Around 9:30 p.m., Security Stand-in Supervisor Alex Traylor went to the North Women's Restroom near Bar 360 and spoke with Gary Heard, the food and beverage manager, about an intoxicated woman inside. (Undisputed Facts ¶ 26; Declaration of Clint Muche ("Muche Decl.") ¶ 4, Ex. B, Deposition of Alex Traylor ("Traylor Dep.") at 16–17, Docket # 29-2.) It was typical for bar

3

staff to alert security if they had concerns about a patron and Traylor testified that Heard informed him the intoxicated patron in the bathroom needed to be cut off. (Traylor Dep. at 17.) The video depicts Traylor speaking with Heard outside of the women's bathroom at approximately 9:36 p.m. (Ex. A at 9:36:17.) Traylor testified that because the patron was in the women's bathroom, he called for a female officer to come to the location. (Traylor Dep. at 17.) Security officers Jocelyn Mason and Nikki Martin responded to the North Restrooms to assist. (Undisputed Facts ¶ 27.)

The video shows Mason enter the bathroom about 30 seconds later. (Ex. A at 9:36:43; Muche Decl. ¶ 8, Ex. F, Deposition of Nikki Martin ("Martin Dep.") at 11, Docket # 29-6.) Mason remains in the bathroom for about one minute, and then exits at 9:37 p.m. and is seen speaking to Traylor, Heard, and a male security officer outside of the bathroom. (Ex. A at 9:37:47.) After speaking to the men for about a minute and a half, Mason goes back into the bathroom. (Ex. A at 9:39:02.) The male security officer exits the video frame at approximately 9:40 p.m. (Ex. A at 9:40:15) and returns about 30 seconds later with a wheelchair (Ex. A at 9:40:41). He wheels the wheelchair to the opening of the women's bathroom door; Martin arrives soon thereafter and enters the bathroom with the wheelchair. (Ex. A at 9:40:47.)

Martin testified that she was called to the North Restrooms to assist with an intoxicated person and when she arrived, Mason was already there. (Martin Dep. at 11.) After entering the bathroom, Martin testified that she found Schlender on the floor in the bathroom stall. (Id.) Martin testified that she tried to wake Schlender up and was eventually able to rouse her enough to assist getting her in the wheelchair. (Id. at 11–12.) Schlender,

4

however, testified that she was neither on the floor nor passed out at this time. (Schlender Dep. at 76.)

At approximately 9:43 p.m., Martin is seen poking her head outside the bathroom door and briefly speaking to Traylor, Heard, and another supervisor, Robert Mueller. (Ex. A at 9:43:06; Traylor Dep. 19, 28.) Martin reenters the bathroom a few seconds later. (Ex. A at 9:43:30.) Schlender testified that after she had been in the restroom for a while, the "next thing I know there's a wheelchair outside and the [casino staff] want me to have a seat in it" and leave the bathroom. (Schlender Dep. at 77.) The video shows Schlender being wheeled out of the bathroom in a wheelchair by Martin, with Mason walking behind, at approximately 9:46 p.m. (Ex. A at 9:46:55–9:46:59.)

### 2.3    Schlender's Time on Casino Floor After Leaving Bathroom

A few seconds later, Schlender gets up from the wheelchair. (Ex. A at 9:47:11.) She testified that she got up because she found it embarrassing to "sit there in the middle of the floor in a wheelchair." (Schlender Dep. at 77.) Schlender walks to the walkway next to the Casino floor and speaks with Mason, Martin, and Traylor. (Ex. A at 9:47:37.) She then sits down on a stool in front of a machine. (Ex. A at 9:47:52.)

The surveillance video lacks audio, and the parties contest the nature of the conversations that occurred next between Schlender and Casino staff. Schlender testified that she wanted to leave the Casino and informed the staff that she was leaving, that it was safe for her to leave, and that she planned to get an Uber or taxi to get home as she recognized it would be irresponsible to drive. (Schlender Dep. at 79–80, 83.) Whereas Traylor and Martin testified that Schlender was acting uncooperative, was slurring her words, and was refusing to leave the Casino. (Martin Dep. at 13, 14; Traylor Dep. at 18–

5

20.) Traylor testified that Schlender appeared intoxicated; he asked her for identification and saw "the poor motor skills of shuffling through them, going past her ID." (Traylor Dep. at 18.) Traylor further testified that at one point, Schlender indicated that she intended to drive home, and Traylor informed her that if she did, Casino staff would inform the MPD of her vehicle information and direction of travel. (Traylor Dep. at 21.)

The video depicts Schlender sitting on the chair in front of the machine for approximately two minutes. (Ex. A at 9:50:04–9:52:46.) During this time, Schlender is seen speaking with Casino staff, using her cell phone, and rummaging around in her purse. (*Id.*) The video appears to depict Schlender locating her identification and showing it to Traylor at approximately 9:51 p.m. (Ex. A.) Although she could not remember doing so (Schlender Dep. at 81), the video shows Schlender poking Traylor with her finger twice (Ex. A at 9:50:04; 9:52:21).

Schlender gets up from the chair in front of the machine at approximately 9:52 p.m. and begins walking with Traylor and other Casino staff members. (Ex. A at 9:52:45.) She then stops and proceeds to do a little dance, continues walking forward, and then resumes dancing. (Ex. A at 9:53:05–9:53:18.) Schlender testified that she remembers dancing and was trying to show the Casino staff that she was fine to leave. (Schlender Dep. at 82.) While Schlender continues walking forward with Casino staff for several more seconds, she then abruptly takes off running onto the Casino floor. (Ex. A at 9:53:34.) Schlender testified that she took off running because she "was done talking" and "wanted to leave." (Schlender Dep. at 83.) Traylor testified that at this point he contacted the on-site MPD officer (Traylor Dep. at 22) because he felt he was "losing control of the situation" and Schlender was refusing to leave (*id.* at 61).

6

### 2.4 Encounter with Officer Seelow

The parties contest the events immediately preceding Schlender's head injury. The video depicts Schlender crouching down, appearing to hide behind the machines. (Ex. A at 9:53:55.) A few seconds later, Schlender again begins running and encounters a uniformed MPD officer. (Ex. A at 9:53:57.) Officer Charles Seelow was the MPD officer working at the Casino that night. (Muche Decl. ¶ 13, Ex. K, Deposition of Charles Seelow ("Seelow Dep.") at 17, Docket # 29-11.) Officer Seelow testified that he heard a request over the Casino-issued radio for assistance and that Schlender appeared to be running away from security staff. (*Id.* at 17–18.) He testified that Schlender appeared highly intoxicated and because he did not know where she was supposed to be, he planned to escort her to the holding room. (*Id.* at 18.) Schlender testified that she could not remember her initial encounter with Officer Seelow; rather, after she took off "the next thing [she knew]" was that someone was "holding me from behind walking behind me down the long hallway." (Schlender Dep. at 84–85.)

The video shows that as Schlender approaches Officer Seelow, he raises his hand in a "stop" position. (Ex. A at 9:53:57.) Schlender walks past Officer Seelow's hand, and he precedes to put a hand on her back and grab her left arm. (Ex. A at 9:53:58.) For approximately the next minute, the video depicts Schlender trying to pull her arm free from his grasp and kick at him several times, dropping her phone in the process. (Ex. A at 9:53:58–9:54:31.) Martin hands Schlender's phone back to her, while Schlender continues trying to pull herself free. (*Id.*) Schlender briefly plants her feet on the floor while Officer Seelow attempts to pull her to walk forward. (*Id.*)

Officer Seelow testified that he grabbed Schlender "by just a normal escort hold for the . . . left arm, and the whole time she was like flailing and just really not coherent." (Seelow Dep. at 18.) Traylor testified that Schlender was verbally resisting Officer Seelow and pulling away from him. (Traylor Dep. at 65–66.) Martin testified that Schlender did not want to leave the Casino and Officer Seelow first grabbed a hold of her arm, but after she started trying to pull away from him, he changed the hold on her and started walking her toward the door. (Martin Dep. at 20.)

For the next 30 seconds or so, Schlender continues to move forward on the walkway, with Officer Seelow holding her left arm behind her back. (Ex. A at 9:54:31–9:55:02.) Schlender then turns away from Officer Seelow and walks backwards towards him. (Ex. A at 9:55:02.) Although the image is far from crystal clear, the camera view from the roulette table appears to depict a foot wearing a thick heeled shoe move backwards (Ex. A at 9:55:06:60–9:55:06:77) immediately before Schlender starts going down and hits her head on the cement pillar (id. at 9:55:09).

Schlender testified that Officer Seelow was holding her in a firm grip and as they neared the cement pillar, she looked over her shoulder and asked him to please let her go and that she would walk, but he grabbed her tighter and she lost her footing and went down. (Schlender Dep. at 88.) Schlender testified that Officer Seelow tugged her so hard that "[her] whole left side of [her] body kind of came off, lifted" and then he forcefully tried to push her down to the ground. (Id. at 88–89.) Schlender testified that she never tried to kick Officer Seelow or break free from his grip. (Id. at 86.)

Officer Seelow testified that after getting about "halfway to the room" Schlender "began to flail, flail her arms, wave her arms around . . . and then all of a sudden she mule-

8

kicked" him and struck his shin with her "big, thick high-heeled shoes." (Seelow Dep. at 23.) Officer Seelow testified that he was not sure if Schlender was trying to get away, so he used "the escort decentralization to escort her to the ground" and "en route or halfway to the ground she hit her head" on a pillar. (*Id.*) Traylor testifies that they were walking close to the concrete pillar and Schlender was "again resisting," and then she "lifted her foot up and kicked" Officer Seelow. (Traylor Dep. at 68.) He stated that Officer Seelow then took Schlender to the ground. (*Id.*) Martin similarly testified that Schlender was "trying to pull away from him and get away from his grip" just before Schlender went to the ground. (Martin Dep. at 21.)

Schlender sustained a 1-1 ½ inch laceration above her right eye. (Undisputed Facts ¶ 37.) She was initially taken to the First Floor First Aid room in the Casino via wheelchair and was subsequently transported to Mount Sinai Hospital via Bell Ambulance at approximately 10:50 p.m. (*Id.* ¶¶ 33–35.) Schlender's blood alcohol content as determined by Mount Sinai Hospital was 0.213. (*Id.* ¶ 36.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

9

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Once again, Schlender sues Officer Seelow under the Fourth Amendment and the City of Milwaukee under *Monell*. I will address each claim in turn.

*1. Unlawful Seizure*

Schlender asserts that Officer Seelow violated her rights under the Fourth Amendment by detaining her without probable cause. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It must be recognized that whenever a police officer accosts an individual and

10

restrains his freedom to walk away, he has 'seized' that person."). Defendants do not dispute Schlender was seized by Officer Seelow. (Def.'s Br. at 9.) Thus, if someone is seized within the meaning of the Fourth Amendment, the next question is what type of seizure occurred. *Irvin v. Kaczmaryn*, 913 F. Supp. 1190, 1197 (N.D. Ill. 1996).

Whether probable cause or reasonable suspicion is needed to justify the seizure depends on the type of seizure that occurred. "Under the principles established in *Terry v. Ohio* and its progeny, even without probable cause, police may conduct an investigatory stop, limited in scope and executed through the least restrictive means reasonable." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "To make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot." *Id.* Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). However, a warrantless seizure beyond the bounds of a *Terry* stop is only constitutional if probable cause existed to justify it, regardless of whether the seizure was labeled an "arrest" by the officers. *Irvin*, 913 F. Supp. at 1197. "Probable cause to make an arrest exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the person arrested has committed, is committing, or is about to commit a crime." *Venson v. Altamirano*, 749 F.3d 641, 649 (7th Cir. 2014). Although it requires something more than a hunch, "probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706,

11

714 (7th Cir. 2013). Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant. *Id.*

Defendants argue that the evidence supports that Officer Seelow had probable cause to seize Schlender for disorderly conduct, or potentially for other crimes, including trespassing. (Def.'s Br. at 11.) Schlender argues that there is no evidence that she engaged in disorderly conduct under Wisconsin law. (Pl.'s Resp. Br. at 11, Docket # 34.) She argues that Wis. Stat. § 947.01 defines disorderly conduct as "whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance" and there is no evidence that she was engaging in such conduct. (*Id.*) She argues that Schlender "was running in a casino, and in Casino personnel's opinion, too drunk to drive. Neither rise to the level of misdemeanor disorderly conduct, especially when the event is put into perspective that it occurred at a gambling casino." (*Id.*)

But probable cause is not proof beyond a reasonable doubt, or even proof by a preponderance of evidence. *Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir. 2003). Rather, probable cause exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the seizure would conclude that the person has committed, is committing, or is about to commit a crime." *Venson*, 749 F.3d at 649. The undisputed evidence supports that a reasonable person confronted with the totality of the facts known to Officer Seelow at the time of the seizure would conclude that Schlender was engaging in disorderly conduct.

To begin, the undisputed evidence supports that Schlender was highly intoxicated during her encounter with Officer Seelow. Schlender argues that Defendants "unfairly"

12

focus on her intoxication level "in an apparent attempt to sway the Court's opinion of her." (Pl.'s Resp. Br. at 4 n.2.) But her intoxication level is not a matter of moral judgment. Rather, it is one factor in the totality of the circumstances before Officer Seelow that supports a finding she engaged in disorderly conduct. Officer Seelow testified that upon encountering Schlender, she appeared highly intoxicated and incoherent. (Seelow Dep. at 16–17.) While Schlender testified that she did not know how intoxicated she was that night (Schlender Dep. at 82, 90), only that she "had a few drinks," (*id.* at 82), the record reflects Schlender's blood alcohol level over an hour after the encounter was 0.213. (Undisputed Facts ¶ 36.) As a point of comparison, the legal blood alcohol limit to drive in the state of Wisconsin is 0.08. *See* Wis. Stat. § 340.01(46m).

Furthermore, Schlender agrees that she was transported to Mount Sinai Hospital via ambulance at approximately 10:50 p.m. (Undisputed Facts ¶ 35.) Schlender's medical records show she arrived at the emergency department at 11:01 p.m. and describe her as "acutely intoxicated." (Muche Decl. ¶ 14, Ex. L, Docket # 29-12 at 2.)[1] Upon physical examination, the records state that Schlender had "alcohol on breath." (*Id.* at 8.) Upon neurological examination, it was noted that Schlender was disoriented to events, place, and situation and that she "does not know where she is or what happened prior to her arriving at the hospital." (*Id.* at 15.)

Officer Seelow also testified that he received word via the Casino-issued radio that Schlender was "running through the casino" and refusing to listen to security staff. (Seelow

---

[1] While Schlender challenges the admission of the Casino Incident Reports as inadmissible hearsay (Docket # 33 ¶ 38), she does not appear to object to the admission of her medical records on hearsay grounds. Fed. R. Evid. 803(4) provides that statements made for medical diagnosis or treatment are not excluded by the rule against hearsay so long as the statement is made for, and is reasonably pertinent to, medical diagnosis and treatment and describes medical history; past or present symptoms or sensations; their inception; or their general cause. The statements cited from Schlender's medical records fit comfortably within this hearsay exception.

13

Dep. at 16–17.) Just prior to encountering Officer Seelow, Schlender is seen on the surveillance video crouching down, appearing to hide behind the machines. (Ex. A at 9:53:55.) A few seconds later, Schlender begins running and encounters Officer Seelow. (Ex. A at 9:53:57.) Despite him raising his hand in a "stop" position, Schlender walks past him without stopping. (Ex. A at 9:53:57–9:53:58.) After grabbing her arm, Schlender begins kicking at Officer Seelow, yanking her arm from his grasp, and planting her feet on the ground so as not to move forward. (Ex. A at 9:53:58–9:54:19.)

Given the totality of the circumstances known to Officer Seelow at the time of the seizure—a highly intoxicated individual running through the Casino, refusing to listen to security staff, failing to stop running when instructed to by a police officer, and acting physically aggressive towards a police officer—a reasonable officer would conclude that Schlender was engaging in violent, boisterous, or "otherwise disorderly" conduct which tends to cause a disturbance. Thus, summary judgment is granted in favor of Officer Seelow as to Schlender's unlawful seizure claim.

 2. *Excessive Force*

Schlender further argues that Officer Seelow used excessive force in seizing her. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). A police officer's use of force is unconstitutional, however, if "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (internal quotations and citations omitted).

14

Assessing the reasonableness of the force used to effect a particular seizure "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The reasonableness standard is objective, 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham*, 490 U.S. at 396).

Schlender argues that Officer Seelow used excessive force when he "escalated to pain compliance" while walking her down the Casino walkway and when he took her to the ground and she hit her head on the concrete pillar. (Pl.'s Resp. Br. at 12–13, 17.) The parties do not dispute that Officer Seelow held onto Schlender's arm as they walked and used a takedown maneuver with the intent of bringing her to the ground. The parties do dispute, however, the events preceding Schlender's injury.

Schlender testified that Officer Seelow was holding her in "a firm grip behind" as she walked with him. (Schlender Dep. at 87–88.) She testified that she looked over her shoulder a little bit to ask Officer Seelow if he could "please let [her] go" and promised that she would "just walk." (*Id.* at 88.) Schlender testified that Officer Seelow grabbed her arm tighter and "tugged [her] so hard that [her] whole left side of [her] body kind of came off, lifted." (*Id.*) Schlender stated that she fell because Officer Seelow "pulled [her] hard" and "forcefully tried to push [her] down . . . to the ground." (*Id.* at 88–89.) She testified that the next thing she remembered was waking up handcuffed in the hospital. (*Id.* at 89.) Schlender

15

denies ever kicking Officer Seelow or trying to break free from his grip at any point during their encounter. (*Id.* at 86, 96.)

Officer Seelow testified that he had Schlender's arm in a "normal escort hold" and that she was "flailing" and incoherent the entire time. (Seelow Dep. at 18.) He further testified that as he escorted Schlender off the Casino floor, at "some point when we got about halfway to the room" Schlender began to "flail her arms" and he was unsure "if she was trying to get away." (*Id.* at 22–23.) He testified that "all of a sudden" Schlender "mule-kicked" him in the shin and she was wearing "big, thick high-heeled shoes." (*Id.* at 23.) Officer Seelow testified that he then "had to use the escort decentralization to escort her to the ground" and "halfway to the ground she hit her head on that said pillar." (*Id.*) Officer Seelow sought medical treatment afterwards (*id.* at 24) and upon physical examination, the treating provider noted an approximately 0.25 cm area of skin abrasion on his left shin (Muche Decl. ¶ 15, Ex. M, Docket # 29-13 at 16).

Traylor was walking with Officer Seelow and Schlender and testified that he observed her pause, and "that's when another like resistance came and that's when she kicked him and he escorted her to the ground." (Traylor Dep. at 37.) Martin testified that she was walking behind Schlender and to Schlender's left and observed Schlender trying to pull away from Officer Seelow immediately before she went to the ground. (Martin Dep. at 21.)

The Casino's surveillance footage provides several views of the incident. Footage entitled "4902 Pit 8 Walkway PTZ" begins at approximately 9:53:52 p.m. and depicts Schlender crouching behind slot machines and then running forward, encountering Officer Seelow at approximately 9:53:57 p.m. Officer Seelow appears to raise his hand in a "stop"

16

motion and Schlender runs past him. (Ex. A at 9:53:58–9:53:59.) Officer Seelow immediately grabs Schlender's left arm. (Ex. A at 9:53:59.) For the next second, the video depicts Schlender kicking at Officer Seelow; however, it does not appear that any of these kicks contact Officer Seelow's body. (Ex. A at 9:54:02–9:54:08.) Schlender briefly attempts to pull her arm from Officer Seelow's grip immediately prior to making the kicking motions. (Ex. A at 9:54:00–9:54:02.) After Martin hands her back her dropped phone, she plants her feet on the floor while Officer Seelow appears to pull her arm. (Ex. A at 9:54:13–9:54:23.) By 9:54:23 p.m., the video shows Officer Seelow holding onto Schlender's left arm and proceeding to escort her down the walkway until they go out of view at approximately 9:54:50 p.m.

The footage entitled "TT Slots Pit 8 PTZ" depicts Schlender turning her body away from Officer Seelow at approximately 9:55:02. Schlender appears to walk backwards towards Officer Seelow (Ex. A at 9:55:02–9:55:04) before turning again to face forward (Ex. A at 9:55:05). Schlender appears to begin moving backwards again and then staggers forwards at approximately 9:55:06, immediately before she goes down to the floor, hitting her head on the pillar, at approximately 9:55:08. The footage entitled "TT13-14-15-16" is a far more distant view. However, at 9:55:02, Schlender can be seen moving backwards towards Officer Seelow before going to the floor at approximately 9:55:06–9:55:08. The video camera set up behind the roulette table gives a front view of the pillar on which Schlender hits her head. The video appears to depict a heeled shoe move backwards at approximately 9:55:06 before Schlender falls to the ground at 9:55:08. The video entitled "4703 TT PTZ" provides a front view of the pillar from overhead. The footage shows

17

Case 2:23-cv-00329-NJ    Filed 12/17/24    Page 17 of 23    Document 39

motion and Schlender runs past him. (Ex. A at 9:53:58–9:53:59.) Officer Seelow immediately grabs Schlender's left arm. (Ex. A at 9:53:59.) For the next second, the video depicts Schlender kicking at Officer Seelow; however, it does not appear that any of these kicks contact Officer Seelow's body. (Ex. A at 9:54:02–9:54:08.) Schlender briefly attempts to pull her arm from Officer Seelow's grip immediately prior to making the kicking motions. (Ex. A at 9:54:00–9:54:02.) After Martin hands her back her dropped phone, she plants her feet on the floor while Officer Seelow appears to pull her arm. (Ex. A at 9:54:13–9:54:23.) By 9:54:23 p.m., the video shows Officer Seelow holding onto Schlender's left arm and proceeding to escort her down the walkway until they go out of view at approximately 9:54:50 p.m.

The footage entitled "TT Slots Pit 8 PTZ" depicts Schlender turning her body away from Officer Seelow at approximately 9:55:02. Schlender appears to walk backwards towards Officer Seelow (Ex. A at 9:55:02–9:55:04) before turning again to face forward (Ex. A at 9:55:05). Schlender appears to begin moving backwards again and then staggers forwards at approximately 9:55:06, immediately before she goes down to the floor, hitting her head on the pillar, at approximately 9:55:08. The footage entitled "TT13-14-15-16" is a far more distant view. However, at 9:55:02, Schlender can be seen moving backwards towards Officer Seelow before going to the floor at approximately 9:55:06–9:55:08. The video camera set up behind the roulette table gives a front view of the pillar on which Schlender hits her head. The video appears to depict a heeled shoe move backwards at approximately 9:55:06 before Schlender falls to the ground at 9:55:08. The video entitled "4703 TT PTZ" provides a front view of the pillar from overhead. The footage shows

Case 2:23-cv-00329-NJ    Filed 12/17/24    Page 17 of 23    Document 39

Schlender's body swaying at approximately 9:55:06 and Officer Seelow taking her to the ground towards the pillar at 9:55:08.

Defendants argue that Officer Seelow's use of force was reasonable and proportional as a matter of law, stating that the "video evidence clearly and unmistakably shows" that Schlender was resisting Officer Seelow's efforts to control her. (Docket # 37 at 14.) It is true that when video footage "firmly settles a factual issue," then "there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). However, the court of appeals has also recognized that videos "are sometimes unclear, incomplete, and fairly open to varying interpretations." *Id.*

Defendants overstate how "clearly and unmistakably" the video footage corroborates Officer Seelow's version of events. In the initial, less-than-a-second timeframe when Schlender first encounters Officer Seelow, the video fairly depicts her trying to pull her arm from his grip and make kicking motions at him. However, after the two begin walking down the pathway through the Casino, and immediately prior to Officer Seelow implementing the takedown maneuver, the video is both unclear and fairly open to varying interpretations. While in the video it appears Schlender turns her body and her body appears to sway or move just prior to the takedown, Schlender testified that she looked over her shoulder to ask Officer Seelow to please let her go, assuring that she would walk on her own. She denies kicking him prior to the takedown. Whereas Officer Seelow testified that Schlender began to flail her arms around as they preceded down the pathway and then "mule-kicked" him in the shin. Again, while the video footage appears to show a heeled foot move backwards, the vantage point is not clear.

18

Thus, this is not a case where the video footage "firmly settles a factual issue." *See Horton*, 883 F.3d at 944. Although the surveillance video captures some of the interaction, it does not fully corroborate either party's version of events. Taking the facts in the light most favorable to Schlender, as I must on summary judgment, a reasonable factfinder could conclude that Officer Seelow employed more force than was justified under the circumstances. Again, Schlender testified that she was trying to leave the Casino and was cooperating with Officer Seelow. She denies physically resisting the escort from the Casino. Further, Officer Seelow was not alone with Schlender, the video confirms he was accompanied by multiple Casino employees. Thus, a reasonable jury could conclude, based on the totality of the circumstances, that the takedown maneuver was excessive. For these reasons, Defendants' motion for summary judgment as to the excessive force claim is denied.

### 3. *Qualified Immunity*

Defendants argue that summary judgment in favor of Officer Seelow is warranted based on the doctrine of qualified immunity. "Qualified immunity serves to protect those public officials who have violated a constitutional right when the contours of that right were not sufficiently clear at the time to enable a reasonable official to know that his conduct was prohibited." *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 687 (7th Cir. 2007). It is clearly established that a police officer may not use excessive force in arresting an individual, *id.*, especially if the individual is not actively resisting, *see Gupta v. Melloh*, 19 F.4th 990, 1001 (7th Cir. 2021) (stating that "significant force is unreasonable after a suspect is subdued or has stopped resisting or evading arrest or is, at most, passively resisting arrest"); *Miller v.*

*Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[T]he law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest.").

The existence of material factual disputes about the circumstances surrounding Officer Seelow's takedown maneuver precludes a ruling on qualified immunity at this juncture. *See Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018). This does not mean, however, that qualified immunity is no longer available as a defense at trial. *See id.* Rather, at trial, a jury may resolve these disputed facts, and the Court will then determine whether Officer Seelow is entitled to qualified immunity as a matter of law. *See id.* Thus, Defendants' motion for summary judgment as to qualified immunity is denied.

    *4.*    Monell *Claim Against the City*

Schlender brings a claim under *Monell* against the City of Milwaukee, alleging that a policy, practice, or custom of the City deprived Schlender of her constitutional rights, and that the City failed to train and supervise its employees. (Compl., Count II.) Under *Monell*, a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents under a theory of *respondeat superior*; rather, it is when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694. Under certain circumstances, a municipality's failure to train its officers can amount to a municipal policy and form the basis for liability under § 1983. *Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1013 (E.D. Wis. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015). The *Brown* court found that:

A municipality will be held liable under a failure-to-train theory only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact. This may arise in either of two circumstances. First, a municipality acts with deliberate indifference when, in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the deficiency exhibits deliberate indifference on the part of municipal policymakers. Alternatively, a court may find deliberate indifference when a repeated pattern of constitutional violations makes the need for further training . . . plainly obvious to the city policymakers. Besides showing that the failure to train constitutes deliberate indifference, the plaintiff must demonstrate a causal connection between the inadequate training and his or her injury.

*Id.* at 1013–14 (internal quotations and citations omitted). Despite the City moving for summary judgment on this claim, Schlender fails to provide evidence in support of her *Monell* claim, nor does her brief address any of the City's arguments. Even as the nonmovant, as the party with the ultimate burden of proof at trial, Schlender retains the burden of producing evidence which would support a reasonable jury verdict. *See Celotex Corp.*, 477 U.S. at 324. She fails to do so. For these reasons, summary judgment is granted in favor of Defendants on Schlender's *Monell* claim against the City.

5. *Summary of Remaining Claims*

In addition to her unlawful detention and excessive force claims against Officer Seelow and her *Monell* and state law indemnification claims against the City of Milwaukee, Schlender also sued Officer Seelow under the Fifth Amendment, alleging he violated her rights by fabricating evidence against her and under state law negligence; former Milwaukee Police Chief Edward Flynn under *Monell*; and the City under *respondeat superior*. (Compl., Docket # 1.) On August 7, 2024, the parties stipulated to dismiss the Fifth Amendment and negligence claims against Officer Seelow (Docket # 23, ¶¶ 1, 3); the *Monell* claim against

Chief Flynn (id. ¶ 2); and the *respondeat superior* claim against the City (id. ¶ 4). The City also stipulated, however, that "if and only if the finder of fact in this case finds that any City employee violated Plaintiff's constitutional rights as alleged in her Complaint," that judgment may be entered against the City for compensatory damages. (*Id.*, ¶ 9.) In other words, the City agrees that it will indemnify Officer Seelow if there is a legal finding that he violated Schlender's constitutional rights as alleged.

With summary judgment granted in Defendants' favor on Schlender's unlawful seizure claim against Officer Seelow and her *Monell* claim against the City, as well as the parties' stipulation of partial dismissal, Schlender may proceed to trial on her excessive force claim against Officer Seelow.

## CONCLUSION

Schlender seeks to hold Officer Seelow liable for her injuries stemming from his alleged Fourth Amendment violations. She further sues the City of Milwaukee under *Monell*. While I find a dispute of material fact remains as to Schlender's excessive force claim against Officer Seelow, I find that summary judgment in favor of Defendants is warranted on Schlender's unlawful seizure and *Monell* claims. Thus, the unlawful seizure and *Monell* claims are dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendants' Motion for Summary Judgment (Docket # 26) is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's excessive force claim will proceed. Plaintiff's unlawful seizure and *Monell* claims are dismissed. The Clerk's Office will contact the parties regarding scheduling this case for trial.

22

**IT IS FURTHER ORDERED** that pursuant to the parties' stipulation for partial dismissal, Plaintiff's Count I Fifth Amendment claim against Officer Seelow is dismissed. Plaintiff's Count II cause of action against Edward Flynn is dismissed and Edward Flynn is dismissed as a party to this action. Plaintiff's Count IV claim for significant bodily harm under state law is dismissed. And Plaintiff's Count V alleging state law *respondeat superior* is dismissed subject to the parties' stipulation regarding indemnity.


Dated at Milwaukee, Wisconsin this 17th day of December, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge